UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

RYAN BOARD,

        Plaintiff,

v.

UNKNOWN WESTON et al.,

        Defendants.

_____/

Case No. 2:19-cv-151

Honorable Paul L. Maloney

## **OPINION**

        This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc–1(a). Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Defendant McLean from the action and will dismiss Plaintiff's free exercise claim for failure to state a claim against the remaining Defendants. The Court also will dismiss for failure to state a claim Plaintiff's request for damages under RLUIPA against the remaining Defendants.

### I. Factual Allegations

Plaintiff presently is incarcerated with the Michigan Department of Corrections (MDOC) at the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa County, Michigan. The events about which he complains occurred at that facility. Plaintiff sues the following URF officials: Food Service Workers (unknown) Weston and (unknown) Burnette; Sergeant Burnhart; Business Manager Edson Forrester; Correctional Officer Sherri Newcomb; and Grievance Coordinator Mike McLean.

Plaintiff is a practicing Sunni Muslim. A central tenet of his belief is that he must pray five times each day at the following times: Fajr (early morning); Zuhr (immediately after the sun begins to decline in the afternoon); Asr (late afternoon); Maghrib (sunset); and Ishe (full dark).

Plaintiff interviewed with Defendant Weston for a job assignment as a food service worker on February 1, 2019. During the interview, Plaintiff explained his need to pray at the appropriate times. Defendant Weston told Plaintiff that it would not be a problem and that he could either pray at the work site or return to his unit for prayer. Plaintiff took the position with this understanding.

On February 2, 2019, however, Defendant Weston informed Plaintiff that, according to Defendant Correctional Officer Newcomb, Plaintiff was not permitted to either conduct his prayers in the kitchen or return to his unit for prayer. Plaintiff took his concerns to Correctional Officer Rolison, who was working at the front desk. Plaintiff took Defendant Weston with him. After discussion, Rolison and Weston permitted him to go to his unit for prayer. Weston informed Plaintiff, however, that he would call Defendant Sergeant Burnhart to clarify if the practice was allowed. After conferring with Burnhart, Defendant Weston told Plaintiff that, under the rules, Plaintiff could neither pray on the work site nor return to his cell. Defendant Weston

told Plaintiff that, if Plaintiff did not work without breaking for prayer, Weston would fire him, place him on "Double 0" or "00" status (under which Plaintiff would be restricted to his room from 2:00 p.m. to 10:00 p.m., seven days a week and would lose all privileges during those hours) and issue a misconduct charge. Alternatively, Weston suggested, Plaintiff could just quit and be placed on 00 status.

On February 4, 2019, Plaintiff spoke to Food Service Supervisor Albonza (not a Defendant), who told Plaintiff, "Don't worry about it, I p[re]fer you prayed here, but don't get caught, or just go back and offer prayer." (Compl., ECF No. 1, PageID.4.) When Plaintiff attempted to leave for prayer, however, Defendant Forrester stopped him, saying that they had just had a meeting on the issue and that nobody was allowed to leave for prayer or pray on the work site. Plaintiff explained that Albonza had given him permission to leave, but Defendant Forrester responded that he ran the kitchen and that, if Plaintiff was caught performing prayers in the kitchen, he would be fired.

Plaintiff filed a grievance on February 4, 2019, complaining about both the February 2 and February 4 incidents. Plaintiff complains that the grievance was not investigated and that he sought a Step-II grievance form after 30 days, because he had received no response to the Step-I grievance.

Plaintiff continued to miss his prayers during his work shifts between February 2 and February 8, 2019. On February 9, 2019, Defendant Burnette called him to work overtime. Plaintiff refused the overtime, because he needed to offer prayer. Defendant Burnette gave Plaintiff a direct order to work. Plaintiff asked to speak with Food Service Supervisor Savior. Plaintiff explained to Savior that he had taken the job after being told he would be allowed to pray in the kitchen or go back to his cell to pray. Plaintiff complained that he now had been threatened

with being disciplined and placed on 00 status. Savior apologized for inconveniencing Plaintiff and told him that they would find someone else to work overtime but that Plaintiff must come during his regular work detail at 2:15 p.m.

As Plaintiff started to leave, he was stopped by Defendant Newcomb. Plaintiff explained that he had permission from Savior to leave for prayer. Defendant Newcomb stated, "'If you go back, I will write you up,' because work details override any religious ten[e]ts or beliefs." (*Id.*, PageID.5.) Newcomb then stated that she would write him up for getting Savior to allow him to return to his cell. Plaintiff asked if Defendant Newcomb was firing him or placing him on 00 status, and she responded that she was.

Plaintiff returned to his cell and wrote a grievance about Burnette and Newcomb. On February 10, 2019, Defendant Newcomb issued a Class-II misconduct ticket for disobeying a direct order. Plaintiff was found guilty of the misconduct on February 13, 2019. As a result of the misconduct proceeding, Plaintiff was given three days of top lock, which resulted in the loss of his prison job. Plaintiff wrote both the food service director and the classification director, explaining the issue and requesting a meeting. Plaintiff also filed a grievance against Defendant Newcomb, complaining that she had issued the false misconduct ticket in retaliation for Plaintiff's grievances. Defendant McLean rejected the grievance as duplicative.

Plaintiff complains that Defendants' refusals to allow him to pray at work or to be excused from work to pray violated his rights under the Free Exercise Clause of the First Amendment and the RLUIPA. Plaintiff also contends that Defendants Newcomb and McLean retaliated against him for filing grievances by writing a misconduct ticket against him or rejecting his grievances.

For relief, Plaintiff seeks only compensatory and punitive damages.

## II.    Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating

5

federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A.     Retaliation

Plaintiff alleges that Defendants Newcomb and McLean retaliated against him for filing grievances. Specifically, he contends that Defendant Newcomb issued a false misconduct charge against him and that Defendant McLean improperly rejected his grievance.

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Plaintiff fails to state a retaliation claim against Defendant McLean, because he cannot demonstrate that McLean engaged in adverse action. The Sixth Circuit has held that, where the defendant's only involvement in the allegedly unconstitutional conduct is "the denial of administrative grievances or the failure to act," the defendant cannot be liable under § 1983. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). The reason is that there must be active unconstitutional behavior. Failing to intervene on a prisoner's behalf to remedy alleged unconstitutional behavior does not amount to active unconstitutional behavior by a person who merely denies an administrative grievance. *Id.* Also, in unpublished decisions, the Sixth Circuit

6

has held that a prisoner's allegation that a defendant improperly denied a grievance is not a claim of constitutional dimension because there is "no inherent constitutional right to an effective prison grievance procedure." *See Overholt v. Unibase Data Entry, Inc.*, No. 98-3302, 2000 WL 799760, at *3 (6th Cir. June 14, 2000); *Lyle v. Stahl*, No. 97-2007, 1998 WL 476189, at *1 (6th Cir. Aug. 3, 1998); *see also Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994) (no constitutional right to a grievance procedure). The Sixth Circuit has only found that there is a constitutional right not to be retaliated against for having filed a nonfrivolous grievance. *See Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000); *Shehee*, 199 F.3d at 301. In light of the foregoing authority, Plaintiff's allegation that Defendant McLean improperly denied his grievance appeal fails to state a claim of constitutional dimension. Because Plaintiff makes no other allegation against Defendant McLean, the Court will dismiss Defendant McLean from the action.

Upon initial review, the Court concludes that Plaintiff's allegations are sufficient to state a retaliation claim against Defendant Newcomb.

### B. RLUIPA

Plaintiff alleges that Defendants Weston, Burnhart, Forrester, Burnette, and Newcomb violated his rights under the RLUIPA, by not permitting him to pray during work hours. RLUIPA applies to prisons that receive federal funds and prohibits state and local governments from placing "a substantial burden" on the "religious exercise" of any inmate unless they establish that the burden furthers a "compelling governmental interest" and does so in the "least restrictive" way. 42 U.S.C. § 2000cc–1(a). To establish a cognizable claim under RLUIPA, the inmate must first demonstrate that a prison policy substantially burdens a religious practice. So long as the practice is traceable to a sincerely held religious belief, *see Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005), it does not matter whether the inmates' preferred exercise is "central" to his faith, 42 U.S.C. § 2000cc–5(7)(A). Once an inmate makes this showing, the prison policy survives only if

7

it serves a compelling governmental interest in the least restrictive way. 42 U.S.C. § 2000cc–1(a); *see also Haight v. Thompson*, 763 F.3d 554, 559-60 (6th Cir. 2014).

Although the statute permits the recovery of "appropriate relief against a government," 42 U.S.C. § 2000cc-2(a), monetary damages are not available under RLUIPA from the states or from officers acting in their official capacities. In *Sossamon v. Texas*, 563 U.S. 277 (2011), the Supreme Court held that the RLUIPA did not abrogate sovereign immunity from damages under the Eleventh Amendment. *See also Cardinal v. Metrish*, 564 F.3d 794, 801 (6th Cir. 2009) ("[T]he Eleventh Amendment bars plaintiff's claim for monetary relief under RLUIPA."). A suit against an individual in his official capacity is equivalent to a suit brought against the governmental entity: in this case, the Michigan Department of Corrections. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). An official-capacity defendant is absolutely immune from monetary damages. *Will*, 491 U.S. at 71; *Turker v. Ohio Dep't of Rehab. & Corr.*, 157 F.3d 453, 456 (6th Cir. 1998); *Wells v. Brown*, 891 F.2d 591, 592-93 (6th Cir. 1989). Therefore, the Court dismisses Plaintiff's official-capacity claims against Defendants for damages under RLUIPA.

In addition, RLUIPA does not permit money damages against state prison officials, even when the lawsuit targets the defendants in their individual capacities. *Haight*, 763 F.3d at 569. As a result, Plaintiff may not recover damages under RLUIPA from Defendants in their individual capacities.

Further, a plaintiff cannot use § 1983 to get damages that RLUIPA does not provide. While § 1983 authorizes individuals to sue to enforce both the "rights, privileges, or immunities secured by the Constitution *and laws*," *id.* (emphasis added), the question whether § 1983 allows a person to enforce a federal statute turns on "whether Congress intended to create

an 'individually enforceable right' and whether Congress wanted the statute to provide the exclusive remedy." *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 460 (6th Cir. 2019) (quoting *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120–21 (2005)). The Sixth Circuit squarely has held that, because RLUIPA creates an individually enforceable right and an express cause of action that precludes damages, the statute demonstrates a congressional intent to preclude using § 1983 as a back door to such damages. *Id.*

Plaintiff seeks only monetary damages. Because Plaintiff may not recover damages from Defendants, in either their official or individual capacities, his RLUIPA claim must be dismissed.

### C. Free Exercise

Plaintiff alleges that Defendants Weston, Burnhart, Forrester, and Burnette violated his right to freely exercise his religion by barring him from engaging in his prayer ritual during work hours, either by praying in the food service area or by returning to his cell to conduct his prayers. The MDOC has adopted the following general policy concerning prisoner religious beliefs:

> Prisoners shall be permitted to exercise their religious beliefs within the constraints necessary for the safety, security and good order of the facility.

MDOC Policy Directive (PD) 05.03.150, Policy Statement. The policy recognizes that

> [r]eligious freedom is a constitutionally guaranteed right. All recognized religions enjoy equal status and protection, subject to those limitations necessary to maintain the safety, good order and security of the facility, including the health and safety of prisoners and staff.

*Id.* The policy directive in issue provides for the following religious accommodations:

> Prisoners may be released from work or school assignments to attend group religious services and approved holy day observances. However, prisoners shall not be released to attend other religious activities. A prisoner must submit a written request to the Warden or designee to be released from his/her work or school assignment at least 15 calendar days prior to the service or holy day observance.

9

> Prisoners released from a work or school assignment to attend group religious services or holy day observances will not be paid for their absence from the assignment. Prisoners shall not return to the assignment at the conclusion of the group religious service or holy day observance unless specifically requested to do so by the work or school supervisor.

PD 05.03.150 ¶ AA. A review of the policy demonstrates that Defendants' decision to deny Plaintiff work release to accommodate his daily prayers during his work hours was consistent with MDOC policy.[1]

While "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates clearly retain the First Amendment protection to freely exercise their religion. *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted). To establish that this right has been violated, Plaintiff must establish that: (1) the belief or practice he seeks to protect is religious within his own "scheme of things," (2) that his belief is sincerely held, and (3) Defendant's behavior infringes upon this practice or belief. *Kent v. Johnson*, 821 F.2d 1220, 1224-25 (6th Cir. 1987); *see also Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (same); *Bakr v. Johnson*, No. 95-2348, 1997 WL 428903, at *2 (6th Cir. July 30, 1997) (noting that "sincerely held religious beliefs require accommodation by prison officials").

Prison officials may impinge on these constitutional rights where their actions are "reasonably related to legitimate penological interests." *See Flagner*, 241 F.3d at 483 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). To determine whether a prison official's actions are reasonably related to a legitimate penological interest, the Court must assess the official's actions by reference to the following factors:

---

[1] This Court has concluded that PD 05.03.150, or its virtually identical predecessor, "is not unconstitutional on its face." *Porter v. Caruso*, 479 F. Supp. 2d 687, 700 (W.D. Mich. 2007) (holding that the policy's recognition that prisoners must be "permitted to exercise their religious beliefs within the constraints necessary for the order and security of the facility" rendered the policy enforceable in a constitutional manner); *see also Bennett v. Burt*, No. 1:16-cv-1203, 2016 WL 7034240, at *6 n.1 (W.D. Mich. Dec. 2, 2016) (same).

> 1. does there exist a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;
>
> 2. are there alternative means of exercising the right that remain open to prison inmates;
>
> 3. the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and
>
> 4. whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89-91). The Supreme Court repeatedly has emphasized the deference that courts must afford prison officials in applying this standard. *See, e.g., Beard v. Banks*, 548 U.S. 521, 535 (2006) (criticizing lower court for "offer[ing] too little deference to the judgment of prison officials"); *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (holding that courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them"); *Shaw v. Murphy*, 532 U.S. 223, 229 (2001) (reiterating the deference owed to prison officials "who are actually charged with and trained in the running of the particular institution under examination").

Failure to satisfy the first *Turner* factor renders the regulation or action infirm, without regard to the remaining three factors. *Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89-90) ("a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational"). If the first factor is satisfied, the remaining three factors are considered and balanced together; however, they are "not necessarily weighed evenly," but instead represent "guidelines" by which the court can assess whether the policy or action at issue is reasonably related to a legitimate penological interest. *Flagner*, 241 F.3d at 484 (citations omitted). It should further be noted that the *Turner* standard

is "not a 'least restrictive alternative' test" requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Instead, the issue is simply whether the policy or action at issue is reasonably related to a legitimate penological interest. *Id.*

In reviewing the sufficiency of the complaint, this Court accepts as true Plaintiff's allegations that his sincerely held religious beliefs require him to make formal prayers five times each day at specific times. Nevertheless, established case law does not support his claim that a prison's work policy that prevents Plaintiff from making demonstrative prayers during work and from leaving work to make those prayers violates the Free Exercise Clause.

In *O'Lone*, 482 U.S. 342, the Supreme Court considered a plaintiff's Free Exercise claim about a prison work policy that prevented plaintiff from being released to attend Jumu'ah services on Fridays. Applying the *Turner* factors, the Court held that the policy was reasonably related to a legitimate penological interest, recognizing that "the very stringent requirements as to the time at which Jumu'ah may be held may make it extraordinarily difficult for prison officials to assure that every Muslim prisoner is able to attend that service." *Id.* at 351. In reaching its decision, the Court balanced the prison's concerns for institutional order and security, the reasonableness of the restriction, the lack of de minimis alternatives, and the other means available to the prisoner to practice his religion. *Id.* at 349-53. Among other concerns, the *O'Lone* Court recognized that the burden imposed on correctional officers to return individual prisoners from work for the service was far more than de minimis, draining prison resources at a sensitive time. *Id.* at 351. In addition, the Court found that making special arrangements for one set of prisoners would cause perceived favoritism among other prisoners employed in the same jobs. *Id.* at 353.

12

Logic dictates that the Supreme Court's determination in *O'Lone*—that the Free Exercise Clause does not require prisons to allow Muslim prisoners to leave work to attend Jumu'ah one time each week—necessarily precludes a determination that prisons must either allow demonstrative prayer on work sites or allow a prisoner to leave work and return to his cell multiple times each day, in order to engage in demonstrative prayer. For this reason alone, the Court concludes that Plaintiff fails to state a free exercise claim.

Other courts that have considered the issue have agreed. In *Williams v. Sec'y Penn. Dep't of Corr.*, 450 F. App'x 191 (3d Cir. 2011), the Third Circuit upheld the district court's conclusion that proscribing demonstrative prayer in a corner of the kitchen did not violate the Free Exercise Clause. The court held that the prison had an interest in maintaining institutional order that was rationally connected to the institutional policy that prisoners follow orders and not be present in unauthorized areas, especially in the kitchen where a number of tools can be used as weapons. *Id.* at 195. The *Williams* court concluded that the plaintiff had alternative means of practicing his religion, including praying silently, offering other daily prayers in his cell, and attending group services. Citing *O'Lone*, the court held that the plaintiff's suggested alternatives—creating a designated place in the kitchen for prayers or returning prisoners to their cells for prayers—would impose far more than a de minimis burden on the inmates, guards, and prison resources. *Id.* As a consequence, the court concluded that the plaintiff's claim failed the *Turner* test. *Id.*

Similarly, in *Jackson v. Maemisch*, 726 F. Supp. 2d 991, 1000-03 (W.D. Wis. 2010), after careful analysis of all of the *Turner* factors, the court held that prison officials did not violate the First Amendment by refusing to allow the plaintiff to perform his demonstrative daily prayer during work hours in the coatroom of the kitchen. *Id.* at 1000-03. The *Jackson* court

13

emphasized the disruption to food production caused by persons who leave the kitchen to pray, the need for additional screening of property used to pray (i.e., prayer rugs), and the risks of harassment from other prisoners. *Id.* at 1001. In support of its position, the *Jackson* court cited *Jihad v. Fabian*, 680 F. Supp. 2d 1021 (D. Minn. 2010), in which the court concluded that the religious rights of Muslim prisoners were not violated by refusing to allow them to leave their cell five times a day for prayer. *Id.* at 1036 (recognizing that neither the Free Exercise Clause nor the RLUIPA require burdensome alterations to work schedules or the congregation of Muslim prisoners five times per day in common spaces, at the expense of other prisoners' use of those spaces). *See also Miller v. Bouchard*, No. 9:10-CV-983, 2013 WL 1294417, at *9 (N.D.N.Y. Mar. 4, 2013) (same).

In *Totten v. Caldwell*, No. 11-12485, 2012 WL 3965045 (E.D. Mich. July 31, 2012), the court held that PD 05.03.150 (BB)[2] was not unconstitutional on its face. *Id.* at 12. The court, applying *O'Lone*, also concluded that the refusal to allow a prisoner to leave work and school assignments to attend the Al-Jumu'ah prayer service had a rational connection with a legitimate governmental interest. *Id.* at 13. Relying on *O'Lone*, the Court emphasized the impact accommodating the plaintiff would have on officers and other inmates, holding that "the Supreme Court has held that 'special arrangements for one group would create problems as []other inmates [see] that a certain segment is escaping rigorous work detail[] and perceive favoritism.'" *Id.* (quoting *O'Lone*, 482 U.S. at 353) (internal quotations and citations omitted). The *Totten* court also concluded that Plaintiff had ample other means of practicing his religion and that there were no ready alternatives to the prison rules that would not impose more than a de minimis cost on the prison. *Id.* (citing *O'Lone*, 482 U.S. at 350-353); *see also Dowdy-El v. Caruso*, No. 06-11765,

---

[2] The version of MDOC policy found constitutional in *Totten* was even more restrictive than the current version of the policy, which now is found at PD 05.03.150(AA).

2012 WL 8170409 (E.D. Mich. July 24, 2012) (applying *O'Lone* and holding that the MDOC policy of not allowing work release to celebrate Jumu'ah was reasonably related to legitimate penological interests).

Answering a related question, the court in *Withrow v. Bartlett*, 15 F. Supp. 2d 292 (W.D.N.Y. July 16, 1998), concluded that a prison's ban on demonstrative prayer (but not nondemonstrative prayer) in the recreational yard did not violate the Free Exercise Clause. *Id.* at 296. The court also concluded that the constitution did not require that Muslim prisoners be permitted to return to their cells from the yard for prayer and then be permitted to rejoin the yard. *Id.* at 297-98.

Applying *O'Lone* and subsequent lower-court cases, the Court concludes that Plaintiff's allegation that Defendants violated the Free Exercise Clause by denying him the right to either engage in demonstrative prayer in the kitchen or return to his cell during work hours fails to state a claim.

### **Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Weston, Burnhart, Forrester, Burnette, and McLean will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court will also dismiss, for failure to state a claim, Plaintiff's RLUIPA and free exercise claims against remaining Defendant Newcomb. Plaintiff's retaliation claim against Defendant Newcomb remains in the case.

An order consistent with this opinion will be entered.


Dated: August 22, 2019 /s/ Paul L. Maloney
Paul L. Maloney
United States District Judge